[Crim. No. 1407.   Third Appellate District.—December 12, 1934.]

THE PEOPLE, Respondent, v. WALTER FOSTER, Appellant.

Chester Monette for Appellant.

U. S. Webb, Attorney-General, and Ralph H. Cowing, Deputy Attorney-General, for Respondent.

THOMPSON, J.—The defendant was convicted of the crime of mayhem under the provisions of section 203 of the Penal Code, and of a prior conviction of robbery perpetrated in the state of Louisiana in 1928. From the judgment of commitment which was accordingly rendered and from the orders he has appealed.

The information contains two counts. The first one charges the defendant with the crime of mayhem committed by feloniously and maliciously biting off the left ear of Adolph Kindberg. The second count charges the defendant with a prior conviction of the crime of robbery alleged to have been secured October 27, 1928, in the fourth judicial district court of the state of Louisiana. The defendant pleaded not guilty of the crime of mayhem, and also pleaded not guilty of that offense by reason of insanity. He also pleaded not guilty of the alleged prior conviction of the crime of robbery. He was first tried and convicted by a jury of the crime of mayhem and also of the prior conviction of the felony alleged to have been committed in Louisiana. He was then tried by the same jury on the issue of his sanity and found to be sane. He was thereupon sentenced to imprisonment in the state prison at Folsom for the period of time prescribed by law.

The appellant contends that neither the verdict finding him guilty of mayhem nor the one finding him sane at the time of the commission of the alleged offense is supported by the evidence. It is also claimed the court erred in admitting evidence of the prior conviction, and in separately trying the issue of the defendant's sanity before the same jury which passed upon his guilt of the crime of mayhem, without first permitting an examination of the jurors with respect to the issue of sanity.

The evidence is sufficient to show the guilt of the defendant of the crime of mayhem as charged in the information. It is true that four of the five witnesses who were called by the prosecution testified they did not actually see the defendant bite off the ear of the prosecuting witness.

All witnesses testified to the fact that an affray occurred between the defendant and Adolph Kindberg. Among a number of other friends, the defendant was invited to attend a party at the home of Adolph Kindberg in Eureka on the night of December 31, 1933. Some liquor was imbibed by the various persons present on that occasion. The defendant became quarrelsome and used vulgar and profane language in the presence of the guests. Mr. Kindberg protested against his conduct and language. The defendant resented the interference of Kindberg and knocked him down. He then continued to strike and beat Kindberg. An affray ensued. The contesting parties were separated. In an effort to prevent the defendant from entering a closet where a loaded rifle was kept, he again assaulted Kindberg, and in the mêlée which then ensued, the defendant bit off a part of Kindberg's left ear. Mr. Kindberg testified in that regard: "I had part of my ear bit off. Q. Who bit your ear off? A. Mr. Walter Foster." One of the witnesses testified that he immediately thereafter picked up a portion of the ear which lay upon the floor and threw it into the stove. A physician also testified that he treated the injured man for the maimed member and that a portion of his ear was gone. The reading of the record leaves no reasonable doubt that the defendant bit off a portion of Kindberg's ear.

■ The verdict of the defendant's sanity at the time of the commission of the offense is also supported by substantial proof. The defendant was a witness in his own behalf on the main trial of the case before the same jury that passed on his sanity. Thirty pages are devoted to the transcription of his testimony. His replies to questions which were propounded to him appear to be perfectly coherent, sound and reasonable. The jurors had an opportunity of observing him on the witness stand and of judging from his conversation, the degree of the rationality of his mind. Another witness testified regarding his conduct and conversation while he remained in jail after his arrest. Four physicians testified as experts regarding his sanity. Three of them said that he appeared to be afflicted with some degree of dementia or paresis as a result of syphilis which he had contracted in 1917. These physicians characterized his mental condition as partial insanity, saying that his afflic-

tion would be aggravated by the excessive use of intoxicating liquor to an extent that he might not know the difference between right and wrong. These physicians, however, agreed to substantially what one of them testified to in the following language: He "does feel his responsibility; in a way he realizes right from wrong; he knows what law is about, what law is for; he knows if a man violates the law he is subject to a penalty . . . his moral sense is slightly blunted". One physician testified that notwithstanding the deterioration of the defendant's brain as a result of syphilis, he absolutely understood the difference between right and wrong, and the nature of the acts which he performed. This witness also testified positively that the use of liquor would not minimize his understanding merely because of his ailment. ▆ But even though the use of liquor does impair the understanding of one who is afflicted with paresis, in its incipiency, we assume that person would still be subject to the established rule that "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition." (Sec. 22, Pen. Code.) The jury was fully instructed in that regard. We are therefore of the opinion there is ample evidence that the defendant was sane at the time of the commission of the offense of mayhem, within the meaning of that term as it is defined with relation to criminal responsibility, and that the verdict is sufficiently supported by competent evidence in that regard.

▆ It did not constitute error for the court to refuse to permit a reexamination of the jurors on their *voir dire* for the purpose of separately trying the issue of the defendant's sanity. (Sec. 1026, Pen. Code; *People* v. *Davis*, 94 Cal. App. 192 [270 Pac. 715]; *In re Merwin*, 108 Cal. App. 31 [290 Pac. 1076]; *People* v. *Leong Fook*, 206 Cal. 64 [273 Pac. 779].) The jurors were fully examined on their *voir dire* at the beginning of the trial. We must assume they were then asked every essential question regarding their qualifications which would apply to every necessary issue in the case. ▆ The trying of an issue of the alleged insanity of a person who is charged with a crime, as provided in section 1026 of the Penal Code, is not a separate trial, but as the Supreme Court says in the Leong Fook case, *supra*, it is merely the separate determination of one

of the issues of the original charge against the accused person. . The issue as to the sanity of an accused person may be tried either by the jury which tries the original cause against him, or by another jury. When the issue of insanity is tried by the same jury which tries the original charge, it is not necessary to either reexamine the jurors on their *voir dire* or to readminister the oath to them.

The court erred in admitting in evidence a purported certificate of the general manager of the Louisiana state prison, in proof of the charge against the defendant of a prior conviction of robbery, without first requiring proof that the person who signed the certificate was in fact the general manager of that institution. This document consists of a copy of the commitment of Walter Foster, together with his photograph and an impression of his fingerprints. A purported certificate of W. H. Long, as warden of the same penitentiary, was also erroneously admitted in evidence, without proof of the genuineness of his signature or of the fact that he was warden of that institution. Neither the signatures to these instruments nor the fact that the signers of the certificates actually held the respective offices of general manager and warden of the state prison were authenticated. There is, therefore, no competent evidence that this appellant actually served time in the Louisiana state prison for the prior conviction of robbery, or that he is the same person who was sentenced to imprisonment in that institution.

It is true that one Walter Foster was actually convicted of robbery and sentenced to imprisonment by the Fourth District Court of Louisiana. The judgment of his commitment to the Louisiana state prison at Baton Rouge was duly certified by the judge of that court, and his signature and official standing were authenticated in the manner required by law. That document was therefore properly admitted in evidence at the trial of this case.

It is also true that our courts will take judicial notice of the statutes of Louisiana (3 Const. and Stats. of La., p. 1659; Act 70, Stats. 1900, p. 116, sec. 2, and amendment thereto; Act 137, Stats. 1916, p. 324), which vest the general manager of the state penitentiary with the custody and control of the records thereof. (Sec. 1875, subd. 3, Code Civ. Proc.; *People* v. *Darling*, 120 Cal. App. 453 [7 Pac. (2d) 1094].)

■ Section 969b of the Penal Code provides that:

"For the purpose of establishing *prima facie* evidence of the fact that a person . . . has been convicted of an act punishable by imprisonment in the state prison of this state, and has served a term therefor in any penal institution, or has been convicted of an act in any other state, which would be punishable as a crime in this state, and has served a term therefor in any state penitentiary or reformatory, . . . the records or copies of records of any state penitentiary . . . in which such person has been imprisoned, when such records or copies thereof have been certified by the official custodian of such records, may be introduced as such evidence."

The preceding section authorizes the filing of copies of the records of any state penitentiary "certified by the official custodian of such records" as *prima facie* evidence of a prior conviction of an accused in another jurisdiction, and as proof of the further fact that he actually "served a term therefor". This section of the code, however, does not dispense with the necessity of proving that the purported certificate is actually signed by that particular officer. Clearly preliminary proof is required that the certificate is genuine. It must be first shown that the person who signs the instrument is really the officer who actually has charge of its records before his certificate to the copies thereof may be admitted in evidence. It would be a travesty on justice to permit the filing of purported copies of the records of a state institution without requiring preliminary proof of the genuineness of the signature to the certificate attached thereto, and without proof of the fact that the individual who signs the document is really the officer who is authorized to do so. The mere existence of a purported certificate to the records of a state institution, without proof of the identity or official authority of the individual who has signed it, does not rise to the dignity of evidence which is worthy of consideration. In the present case neither the certificate of the general manager of the Louisiana penitentiary nor of the warden of that institution is sworn to, acknowledged or otherwise authenticated. If a notary public had certified that he knew them to be the persons and the officers they represented themselves to be, and the authority of the notary were authenticated in the manner required by law, we have no doubt the certificate of the general manager of the Louisiana state prison, regarding the facts therein stated, would

become competent evidence of the identity of Walter Foster and of the fact that he had actually served time in that prison for the prior conviction of robbery.

In support of the competency of these unauthenticated certificates of the general manager and the warden of the Louisiana state prison, the attorney-general has cited *People v. Murphy,* 139 Cal. App. 722 [34 Pac. (2d) 723] , *People v. Sheridan,* 136 Cal. App. 675, 682 [29 Pac. (2d) 464] , *People v. Darling,* 120 Cal. App. 453 [7 Pac. (2d) 1094], and *People v. Wilson,* 139 Cal. App. 139 [33 Pac. (2d) 476]. None of these cases involve the preliminary proof of the authenticity of the signatures of the officers signing the certificates. The Sheridan case states that the signature to the copies was duly authenticated by the clerk and the judge of the county. The question of the genuineness of the signatures and the official capacity of the signers of the certificates in the other cases were not involved. It is contended in these other cases that there was a lack of evidence that the signers of the certificates had legal custody of the records. These cases merely hold that our courts will take judicial notice of the statutes of a sister state which designate the officer having charge of the records of a state prison.

For the reason that there is no authentication of the signatures or official standing of the general manager and warden of the Louisiana state prison, their certificates were erroneously admitted in evidence, and the record on appeal therefore contains no competent evidence that this defendant served time for the prior offense of robbery in the Louisiana state prison or that the impression of his fingerprints is genuine. For the same reason, there is no competent evidence that this defendant is the same person who was formerly convicted of robbery in the Louisiana court.

The judgment is reversed in so far as it applies to the former conviction of the defendant. The fact that the evidence is insufficient to sustain the judgment of conviction and the service of a sentence for the former offense, in no way affects the sufficiency of the evidence or the validity of the judgment of conviction of the main charge of mayhem.

The judgment of conviction of the crime of mayhem and the orders are affirmed.

Pullen, P. J., and Plummer, J., concurred.